Filed 6/18/15  Marriage of Bowles CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of CLARENCE WALTER and PEARL CHRISTINE BOWLES. | |
| CLARENCE WALTER BOWLES,        Appellant,                   v.  PEARL CHRISTINE RIVERS,        Appellant. | Consolidated Cases Nos. F066703 & F067739  (Super. Ct. No. VFL234317)  **OPINION** |
| In re the Marriage of CLARENCE WALTER and PEARL CHRISTINE BOWLES.  CLARENCE WALTER BOWLES,        Appellant,                   v.  PEARL CHRISTINE RIVERS,        Respondent. | Consolidated Cases Nos. F067739 & F068686  (Super. Ct. No. VFL234317) |

APPEAL from a judgment of the Superior Court of Tulare County.  Bret D. Hillman, Judge.

Harbottle Law Firm and C. D. Harbottle; McCormick, Barstow, Sheppard, Wayte & Carruth and Todd W. Baxter for Appellant Clarence Walter Bowles.

Dowling Aaron and Stephanie Hamilton Borchers for Appellant and Respondent Pearl Christine Rivers.

-ooOoo-

This is a consolidated appeal from the January 8, July 11, and October 24, 2013, orders of the Superior Court of Tulare County.  On September 17, 2009, in contemplation of divorce, Clarence Walter Bowles (Walter) and Pearl Christine Rivers (Christine)[1] entered into a mediated marital settlement agreement (MSA).  A judgment of dissolution incorporating the MSA was entered on November 6, 2009, and the parties' marriage terminated on March 11, 2010.  On October 26, 2011, Christine, who subsequently remarried, moved to set aside the property division component of the dissolution judgment and MSA pursuant to Family Code sections 2121 and 2122.[2]  She alleged, inter alia, that Walter failed to comply with the disclosure requirements of section 2100 et seq.  On January 8, 2013, the superior court granted the motion and awarded Christine $80,000 in attorney's fees and $32,000 in costs pursuant to sections 2030 and 2032.  In its statement of decision, the court found, inter alia, that Walter (1) did not serve a preliminary disclosure declaration; (2) breached his fiduciary duty under section 721 by failing to disclose an asset, i.e., the Mendonca Note (at p. 7 & fn. 9, *post*); (3) "obtained

---

[1]    Customarily, in family law proceedings, we refer to the parties by their first names for purposes of clarity and not out of disrespect.  (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)  However, the record here typically identifies the parties as "Walter" and "Christine" rather than "Clarence" and "Pearl."  To maintain consistency, we shall also use "Walter" and "Christine."

[2]    Unless indicated otherwise, subsequent statutory citations refer to the Family Code.

more valuable assets" than Christine under the MSA, including "most of the active farming entities and working petroleum interests"; (4) "did not pay his taxes properly," given that he "lost … hundreds of thousands of dollars … annually and still kept increasing … cash and assets"; (5) sold oil and gas interests for over $800,000 in 2011, "received and reinvested the proceeds from those sales in real estate in 2011," and tried to "avoid paying the taxes until 2012 through some sort of escrow arrangement"; and (6) submitted "incomplete," "unreasonably late," "unorganized," "duplicative," and "redacted" financial documents in response to discovery orders.

Walter filed a timely appeal.[3]  In his opening brief, he concedes that he never served a preliminary disclosure declaration and the MSA excluded the Mendonca Note. Nonetheless, he argues Christine's set-aside motion was untimely; his noncompliance with the disclosure requirements did not constitute prejudicial error; and the trial court erroneously barred the mediator as a witness and awarded attorney's fees and costs.  In his reply brief, Walter adds that his noncompliance was permissible under *In re Marriage of Woolsey* (2013) 220 Cal.App.4th 881 (*Woolsey*) and *In re Marriage of Evans* (2014) 229 Cal.App.4th 374 (*Evans*).

Meanwhile, Christine requested attorney's fees to defend against Walter's appeal from the January 8, 2013, order.  On July 11, 2013, the trial court awarded her $50,000 pursuant to sections 2030 and 2032.  Christine then asked for costs associated with the enforcement of the January 8, 2013, award as well as attorney's fees to file an extraordinary writ petition on the issue of whether a need-based attorney's fees and costs award in a family law proceeding may be bonded and stayed on appeal.  On October 24, 2013, the court awarded her $10,000 in costs and $20,000 in attorney's fees pursuant to sections 2030 and 2032.[4]

---

[3]    Christine filed a protective cross-appeal.

[4]    This court summarily denied the extraordinary writ petition on December 11, 2013, in case No. F068258.

3.

Walter filed another timely appeal, this time from the July 11 and October 24, 2013, orders.[5] Walter makes several contentions. First, the awards were not just and reasonable under the relative circumstances of the parties. Second, the October 24, 2013, award of costs should not have been granted since Walter was in the process of filing an undertaking. Third, the October 24, 2013, award of attorney's fees was "contrary to the stated purpose of need based fees."

As to the January 8, 2013, order, we find Walter breached his fiduciary duty to disclose all assets in which he had or may have had an interest by failing to disclose the Mendonca Note; Christine discovered the breach less than a year before she filed her set-aside motion; and Walter's nondisclosure materially affected the judgment.[6] We also find the trial court did not abuse its discretion either when it barred the mediator as a

---

[5]    By order dated May 13, 2015, we consolidated the appeals in cases Nos. F066703 and F067739. (In an order dated Feb. 11, 2014, case No. F068686 was consolidated with case No. F067739.)

[6]    Walter contends on appeal that the set-aside motion was untimely because Christine first discovered his failure to complete and exchange the preliminary disclosure declaration on September 17, 2009, more than two years before she filed the motion. "If correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion." (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568; accord, *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19; *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.) Since we find the court's ruling correct on a different premise (i.e., Christine discovered Walter's failure to disclose the Mendonca Note within the limitations period), we need not address whether Christine timely discovered Walter's other breach of fiduciary duty (i.e., the failure to complete and exchange a preliminary disclosure declaration). To the extent Walter argues *Woolsey* and *Evans* are relevant to his failure to disclose, we disagree. *Woolsey* did not extinguish the disclosure requirements, but only relaxed the statutory obligation to exchange preliminary and final disclosure declarations before the parties enter into a mediated MSA. *Evans* did not depart from the mandate that preliminary disclosure declarations be served with, or subsequent to, the filing of the petition for dissolution. The MSA in this case, contrary to the situation in *Evans*, was signed more than one week after the petition for dissolution was filed.

4.

witness or when it awarded attorney's fees and costs.[7]  As to the July 11 and October 24, 2013, orders, we reject Walter's contentions and affirm.[8]

## FACTUAL AND PROCEDURAL HISTORY

### I.  The dissolution proceeding.

Walter and Christine married on October 27, 1979, and separated on June 1, 2009. Walter filed a petition for dissolution of marriage on September 9, 2009.  On September 17, 2009, the parties signed a mediated MSA.  Paragraph IV. (Division of Property) of the agreement identified certain assets—e.g., oil interests, real estate, bank accounts, cattle, hay, personal effects—and described their distribution.  Paragraph IX. (Waiver of Filing of Final Declaration of Disclosure) declared that Walter and Christine "completed and exchanged preliminary disclosure declarations" and "knowingly, intelligently, and voluntarily" "waive[d] the exchange of final declarations of disclosure pursuant to … [s]ection 2105."  Paragraph X. (Warranties and Covenants) assured that neither person "own[ed] any property of any kind, other than the property listed in [Paragraph IV.]."  Paragraph XIX. (Legal Representation) indicated that Walter and

---

**7**      Because we affirm the January 8, 2013, order, we dismiss the cross-appeal as moot.  (*Najera v. Huerta* (2011) 191 Cal.App.4th 872, 874, 880.)

**8**      In a respondent's brief filed June 2, 2014, Christine asked us to "resolve the open question of whether … section 2030 need based fees can be stayed pending appeal."  In a reply brief filed August 22, 2014, Walter asserted, inter alia, that this issue was not properly before us.  Effective January 1, 2015, section 917.75 of the Code of Civil Procedure states:

> "The perfecting of an appeal shall not stay enforcement of the judgment or order of the trial court awarding attorney's fees or costs, or both, if the judgment or order appealed from was rendered in a proceeding under the Family Code, unless an undertaking is given in a sum and upon conditions fixed by the trial court."

In view of this provision, Christine informed us in a written correspondence filed January 30, 2015, that she "no longer requests additional examination" of the matter "in the interest of judicial economy."  We consider the issue withdrawn.

Christine (1) retained Stanley M. Michner to mediate the settlement and draft the MSA; (2) were advised of and waived their respective rights to independent counsel; (3) "freely and voluntarily entered into this [MSA] with full knowledge of its terms and legal effects"; and (4) "agreed to this [MSA] without requiring … Michner to obtain appraisals of [*sic*] independent investigations as to any community assets and hold[] [him] harmless thereon."

Walter and Christine also signed a "Stipulation and Waiver of Final Declaration of Disclosure." (Some capitalization omitted.) The document read:

"1.     Under … section 2105[, subdivision ](d), the parties agree to waive the requirements of … section 2105[, subdivision ](a) concerning the final declaration of disclosure.

"2.     The parties agree as follows:

"a.     We have complied with … section 2104, and the preliminary declarations of disclosure have been completed and exchanged.

"b.     We have completed and exchanged a current *Income and Expense Declaration* … that includes all material facts and information on each party's earnings, accumulations, and expenses.

"c.     We have fully complied with … section 2102 and have fully augmented the preliminary declarations of disclosure, including disclosure of all material facts and information on [¶] (1) the characterization of all assets and liabilities, [¶] (2) the valuation of all assets that are community property or in which the community has an interest, and [¶] (3) the amounts of all community debts and obligations.

"d.     Each of the parties enters into this waiver knowingly, intelligently, and voluntarily.

"e.     Each party understands that this waiver does not limit the legal disclosure obligations of the parties but rather is a statement under penalty of perjury that those obligations have been fulfilled.

6.

> "f.     The parties also understand that if they do not comply with these obligations, the court will set aside the judgment."

A judgment of dissolution incorporating the MSA was entered on November 6, 2009. Walter and Christine's marriage terminated on March 11, 2010. Christine remarried on December 31, 2010, and relocated to Kansas.

## II.     Christine's set-aside motion.

On October 26, 2011, Christine moved to set aside the property division component of the November 6, 2009, dissolution judgment and MSA, citing Walter's failure to comply with the statutory disclosure requirements, inter alia. An accompanying memorandum of points and authorities specified:

> "On or about April 18, 2011, in connection with a motion to secure compliance with the terms of the Judgment filed on November 6, 2009, [Christine]'s attorney conducted a records search in the Tulare County Recorder's Office. During that search, [Christine]'s attorney discovered [Walter] owner-financed the sale of a piece of property to Jacob A. Mendonca and Andrea Lowry Mendonca in the amount of $200,000.00. The Mendoncas executed a Promissory Note,[9] secured by the property, and agreed to pay [Walter] monthly payments on the Note until it was paid in full. [Christine] did not recall this transaction until it was brought up to her by her attorney."

> "[Walter] warranted to [Christine] that [certain] assets were the only properties in which he had an interest by way of Paragraph X of the [MSA] at the time the parties signed the Agreement. Nowhere was any mention made of [the Mendonca] Note in the amount of $200,000.00. [¶] … [¶]

> "… [Walter] never served [Christine] with a Preliminary Declaration of Disclosure or an Income and Expense Declaration, nor was [Christine] ever informed of her and [Walter]'s obligations to prepare and serve such disclosure declarations; [Christine] learned of the mandatory disclosure rules only after meeting with her attorney on April 4, 2011.

> "While the Family Code permits the parties to waive service of the Final Declaration of Disclosure, which the parties did in the instant case,

---

**9**     Hereafter, we identify the promissory note as either "Note" or "Mendonca Note."

there is no such provision permitting the parties to waive preparation and service of the Preliminary Declaration of Disclosure.

"[Christine] relied on the warranties made by [Walter] regarding the assets and liabilities of the parties as set forth in Paragraph IV of the [MSA]. [Christine] was unaware of the $200,000.00 [Mendonca] Note that [Walter] failed to disclose; had he done so, she would not have agreed to him receiving 100% of same.

"… Section 2122[, subdivision ](f) permits the trial court to set aside a Judgment based on a failure to comply with the disclosure requirements of … [s]ection 2100 et seq. so long as the motion is brought within one year after the complaining party either discovered, or should have discovered, the failure to comply. [Christine] learned of [Walter]'s failure to comply with the disclosure requirement on April 4, 2011; this motion is therefore timely."

Christine requested an order compelling Walter to pay for her attorney's fees "based upon the substantial disparity of income between [them]."

In response, Walter maintained that Christine knew or should have known about the Mendonca Note because they (1) received monthly payments from the Mendoncas since 2003; (2) reported interest on the Note on their joint tax returns; (3) talked about the Note in the course of mediation; and (4) reached a postmediation agreement that allowed him to keep the Note. He further contended that Christine filed an untimely set-aside motion and did not establish prejudice.

## III.    Matters preceding the hearing on the set-aside motion.

a. *Walter's noncompliance with discovery orders.*

At an October 19, 2012, hearing, the superior court found that Walter did not fully comply with at least six separate discovery orders. In particular, he either failed to deliver documents or "slopp[il]y" delivered partial, incomplete, and/or redacted documents related to his income taxes, bank accounts, and oil and gas interests. The court ordered Walter to produce the appropriate paperwork.

8.

b. *The mediation privilege.*

Walter sought to depose Michner regarding "a number of things which he said occurred during his various meetings with the parties to this action back in 2009 …." In a November 9, 2012, letter, Michner asserted the mediation privilege pursuant to Evidence Code section 1115 et seq., but agreed to testify if both parties waived confidentiality. In a November 9, 2012, facsimile to Walter, Christine refused to waive confidentiality. Walter asked the court to address the applicability of Evidence Code section 1115 et seq.

On December 11, 2012, prior to the start of the motion hearing, the court ruled that the mediation privilege applied:

> "The retainer agreement refers to Mr. Michner as being retained as a mediator. He acted in this case as a mediator, he is referred to by both parties in pleadings as a mediator. The [MSA] refers to him as a mediator and then the question becomes, did he waive that privilege? [¶] It appears clear from his correspondence he is asserting that privilege pursuant to his letter and his refusal to be d[e]posed. [¶] … So no, I am not going to have Mr. Michner as a witness."

The court subsequently denied Walter's request to have Michner testify as to "his normal procedures … when he is mediating cases," "whether or not he observed any tension … between the parties," and "whether or not he met with either party outside the presence of the other."

c. *Income and expense declarations.*

In her income and expense declaration filed December 7, 2012, Christine related that she owned and managed a flower shop, but did not earn a salary. She received monthly payments of $725 from rental properties and $6,000 from royalty and overriding royalty interests. Christine's liquid assets were worth $22,500. All other property—real and personal—was worth $120,000.[10] Christine estimated that her monthly expenditures

---

[10]    At the motion hearing, Christine testified that an earlier income and expense declaration listed the value of her liquid assets as $120,000. She used $89,000 to

totaled $12,773.  Her husband, Douglas Rivers, earned $13,500 per month and paid some of the household expenses.  For the set-aside action, Christine retained two attorneys: Michael Hatherley and Michael Hepperly.  Each charged $250 per hour.  As of December 6, 2012, Christine paid them a total of $79,239.80, which came from personal savings, home equity credit lines, and other loans.  She still owed Hatherley $9,042.01.

In his income and expense declaration filed December 10, 2012, Walter related that he earned $14,111.11 per month as a farmer and $585.58 per month as an owner of working interests in oil.  He also received monthly payments of $512.09 from dividends and interests, $958.34 from rental properties, $11,324.59 from capital gains, and $1,067.50 from Social Security's retirement fund.  Walter's assets were worth an estimated $1.4 million.  His actual monthly expenditures amounted to $9,258.  Walter's disabled adult daughter, who lived with him and earned a gross monthly income of $839.66, did not pay for any of the household expenses.  For the set-aside action, Walter hired attorney C. D. Harbottle, who charged $280 per hour.  As of December 10, 2012, he paid Harbottle $60,867.78, but still owed her $19,922.42.

In a declaration dated December 10, 2012, Hatherley attested:

"In preparing for the hearing[] on the [set-aside motion], I have propounded discovery on [Walter].  [Walter] failed to provide the discovery requested of him, thereby forcing [Christine] to file a motion to compel his answers to discovery, along with discovery sanctions.  Even after the court ordered [Walter] to produce documents at the September 24, 2012, hearing, [Walter] did not.  [Christine] was forced to file an ex parte hearing to secure [Walter]'s compliance with this court's prior order.  Even then [Walter], and despite the court's emphatically clear and precise orders, [Walter] was late in providing the documents.  To make matters worse, [Walter] unnecessarily duplicated previously produced documents or produced the same documents twice within production, which caused [Christine] to incur even more fees.  [Walter]'s pervasive insistence to delay, hinder, and evade has caused this case to literally balloon in fees and costs to my client.

purchase one of four royalty interests, which contributed to an increase in her monthly income.

10.

"… Further, due to the fact that these parties to this action own assets in three different states, and [Walter] did not provide responses to discovery made of him, it was necessary to employ the services of [Hepperly,] an attorney in the state of Kansas, the state in which most of the parties' assets are located, to locate and identify such assets not disclosed by [Walter].

"… When [Christine] first hired this law firm, I would have estimated her entire case would have cost no more than $10,000.00. Due to [Walter]'s unwillingness to comply with any discovery, delay in providing documents as ordered by this court on not less than two occasions, and the active concealment of community property assets, the fees and costs associated with this matter has vastly exceeded my initial reasonable estimation of cost."

## IV. The hearing on the set-aside motion.

a. *Christine's testimony.*

Christine testified that she and Walter were married for 30 years. During this period, Walter undertook several business ventures. He farmed various crops, purchased, refurbished, and resold farm implements, and purchased, developed, and resold land. Starting in early 2000, Walter acquired working, mineral, royalty, and overriding royalty interests in oil. Christine sometimes accompanied him to oil production auctions in Kansas, but her understanding of the oil interests was limited to "what [he] told [her]." Although she wanted to learn more about the business ventures, Walter refused to teach her. Christine did not examine the bank accounts or attempt to "understand … the financial flow" because Walter "took care of it." They met with their accountant and signed joint tax returns annually, but she never reviewed the returns.

Prior to and during the marriage, Christine owned and managed a flower shop. While the shop had been unprofitable since 2001, she kept it open because Walter "wanted it for a loss write off." Between 2001 and 2009, Christine received her income from royalty and overriding royalty interests.

In 2009, the parties decided to divorce, negotiated the division of property, participated in mediation, and signed the MSA and stipulated waiver. They did not

11.

exchange preliminary disclosure declarations, income and expense declarations, or schedules of assets and debts. Instead, Walter "said what the values of everything were and how he valued them …." Christine did not retain an attorney during this process because (1) Walter "told [her] it would cost $50,000"; and (2) she "[t]otally" trusted him. At this point, she did not remember the Mendonca Note, which was left off the MSA.[11]

On April 4, 2011, following a dispute with Walter over the distribution of assets, Christine consulted Hatherley. Later that month, Hatherley searched the public records and came across the Mendonca Note. In June 2011, Christine discovered that Walter sold an oil well—which he had appraised at under $200,000 at the time of mediation and received in accordance with the MSA—for $775,000.

b. *Walter's testimony.*

Walter testified that Christine was involved "[t]o a degree" in the business ventures. When he first began to acquire oil interests, she often accompanied him to auctions and occasionally signed the paperwork. The two always discussed real estate transactions and met with their accountant together.[12] In addition, Christine had access to records and bank accounts. Walter never intentionally withheld information.

In 2009, Walter and Christine spoke at length about the division of property. They agreed to appraise (1) the oil interests based on their respective purchase prices; and (2) real property based on tax statements from the Tulare County Assessor's Office. Walter negotiated in good faith and did not intend to deceive Christine. Lists specifying the distribution of assets were given to Michner. Walter did not know the meaning of the

---

**11** Christine testified that she had known of the Mendonca Note's existence "at one time," acknowledging that she "sign[ed] some papers" and Jacob Mendonca occasionally visited her shop to deliver payments.

**12** Tim Denton, Walter and Christine's accountant, testified that he prepared the parties' tax returns annually. At face-to-face meetings, (1) Christine appeared to be an "informed participant"; (2) Walter spoke openly in Christine's presence; and (3) Walter and Christine had the opportunity review the returns before they were filed.

terms "preliminary declaration of disclosure" or "final declaration of disclosure," but believed that Michner properly completed the necessary documentation.

Walter conceded that the Mendonca Note was not mentioned in the MSA. He remained unaware of this exclusion until Christine notified him. Sometime after entry of the dissolution judgment, the two reached a separate agreement on the Mendonca Note. In exchange for surrendering her stake in the Note, Christine received extra cattle and hay. Walter added that Christine was involved in the original real estate transaction with the Mendoncas "document-wise and price-wise."

In June 2011, Walter sold two oil producing properties. The first, called "Dreiling C," was originally purchased for $7,000 and sold for $90,000. The second, known as "JF Dreiling," was originally purchased for $75,000 and sold for $775,000. In the interim, Walter spent $270,000 to drill a new well at Dreiling C and over $300,000 on "breakdowns and equipment" at JF Dreiling. He deposited the net sales proceeds—i.e., $827,387.02—into his bank account on July 1, 2011. Thereafter, between July 27, 2011, and July 19, 2012, Walter acquired at least five new properties. He did "[n]ot necessarily" use the Dreiling C and JF Dreiling sales proceeds to finance these purchases.

Walter did not originally report the Dreiling C and JF Dreiling sales proceeds on his 2011 tax return. He claimed that—on the advice of his accountant—he opened a six-month escrow account to defer this income until 2012. The funds, however, were mistakenly transferred in December 2011 rather than January 2012. Walter filed an amended 2011 tax return and paid taxes, penalties, and interest. He did not intend to commit tax evasion or defraud the government.

Walter's past income tax returns showed significant losses. When asked by the court how he could "los[e] money every year on [his] tax return" but still "afford to buy all these oil interests and farms and things," he replied that (1) he "sold a piece of property in Hanford for a million and two"; and (2) "the oil business has a depreciation

13.

amount," meaning he could "make a small amount and still show a loss on the adjusted gross."

c. *Christine's expert witnesses.*

Kenton Hupp, a petroleum engineer, assessed the oil interests identified in the MSA. As of November 6, 2009, Christine's interests were worth "a little over $170,000" while Walter's were worth "a little over $1.8 million." Hupp's valuation method was based on projected revenue and expenses.

Thomas Luhrs, a farmer and professional real estate appraiser, assessed the three 160-acre farms in Kansas given to Walter in accordance with the MSA. He opined that the market value of these farms appreciated from $404,000 as of November 6, 2009, to $912,000 as of October 18, 2012. Timothy Simon, a certified general real estate appraiser, assessed the California real estate identified in the MSA. As of September 17, 2009, Christine's properties were worth $492,000 while Walter's were worth $1,109,000.[13] Both Luhrs and Simon employed the sales comparison approach.[14]

## V.     The January 8, 2013, ruling on the set-aside motion.

In a statement of decision filed on January 8, 2013, the court granted Christine's motion "based upon the grounds of failure of the parties to comply with the mandatory disclosure requirements …."[15] The court detailed:

---

[13]     Simon also assessed and assigned a market value of $492,000 to a residence belonging to Christine that was not listed in the MSA.

[14]     Under the sales comparison approach, the market value of an appraised property is determined by comparing the appraised property with others in the vicinity that possess similar characteristics and have been sold.

[15]     The court qualified its ruling:

"Pursuant to [section] 2125, the court does not find that the division of household goods and furniture, personal effects, farm equipment, clothing, vehicles and silver to be materially affected by the circumstances leading to the court's decision to grant relief. The division of those assets shall stand as previously ordered or agreed and divided by the parties…. The inequality of the division of the parties' bank assets, notes, oil, gas and

14.

"The parties agreed at the time of the hearing in this matter that no preliminary disclosure declarations or income and expense declarations had been exchanged. In hearing this matter, the court was struck many times by the fact that this is the type of action that [section 2100 et seq.] was enacted to prevent. [Section] 2100 requires each party to accurately and completely disclose all assets and liabilities in which the party has or may have an interest or obligation. Each party has a continuing duty immediately, fully and accurately to update and augment that disclosure. All parties agree that this was never done.

"The legislative intent is made clear in section 2100, as the statute reads that the 'Legislature finds and declares' that '[s]ound public policy further favors the reduction of the adversarial nature of marital dissolution and the attendant costs by fostering full disclosure and cooperative discovery' and that '[i]n order to promote this public policy, a full and accurate disclosure of all assets and liabilities in which one or both parties have or may have an interest must be made in the early stages of a proceeding for dissolution of marriage … regardless of [the asset's] characterization as community or separate.'

"[Section] 2122 lists six grounds upon which a motion to set aside a judgment can be based. The list includes the failure of a spouse to comply with disclosure requirements. In this matter everyone agrees that the disclosure requirements were *not* complied with. [Section 2122, subdivision ](f) provides that a proceeding to set aside the judgment based on non-disclosure must be commenced within one year of the date the complaining party discovered or should have discovered the failure to comply with the statute. Both parties were unaware of their obligations to comply with these statutes until they met with their current counsel in 2011, so the request for relief filed in late 2011 was timely.

"The court finds that the division of marital assets was substantially unequal. The court finds that the grounds for relief materially affected the outcome and that the moving party would benefit from granting of the relief prayed for in the motions before the court. Pursuant to [section] 2123 a judgment may not be set aside under section 2122, or under any other law, 'simply because the court finds that it was inequitable when made, nor simply because subsequent circumstances caused the division of assets or liabilities to become inequitable, or the support to become inadequate.' [Citation.] In this case the failure to complete the disclosure declaration is

---

mineral interests, real property and business, ranching and farming assets were of primary importance to the court."

the key factor in the court's decision, not simply the inequality of the property division.

"… Walt[er] argues that ... the parties negotiated extensively, met with their tax accountant together every year, signed joint tax returns and that each had access to bank records. He feels these facts should take the place of the statutory requirement for a preliminary declaration of disclosure. He argues that the parties would likely have reached the same agreement had the mediator prepared the necessary disclosure documents.

"The court knows of no authority which allows it to follow those arguments to the desired conclusion. Walt[er] has cited no law supporting this de facto waiver, contrary to the provisions of [section] 2104, which allows no such waiver absent court order. No case cited by the parties holds that the court can find such a waiver of the preliminary disclosure declaration. Pursuant to that section the declaration of disclosure is to, 'set forth with sufficient particularity, that a person of reasonable and ordinary intelligence can ascertain,' the identity of all assets and liabilities of the parties. The court is not going to speculate what that disclosure declaration and income declaration might have looked like if they had been prepared as required by the Family Code. [¶] … [¶]

"It is clear to the court that Walt[er] did not pay his taxes properly. He brought most of the information to the accountant and the parties could not have lost the hundreds of thousands of dollars they claimed to lose annually and still kept increasing their cash and assets. Walt[er] admitted to selling oil and gas interests and receiving sales proceeds of over $800,000 in 2011 that were not included in his 2011 tax return. He testified that he thought he could avoid paying the taxes until 2012 through some sort of escrow arrangement, but he admitted he received and reinvested the proceeds from those sales in real estate in 2011….

"Overall, the court finds that the negotiations and preparation of the [MSA] were a haphazard process. This was true of the work presented to the mediator to be included in the [MSA] …. By retaining most of the active farming entities and working petroleum interests Walt[er] obtained more valuable assets …."

"[A] clear breach of the fiduciary duty was the Mendonca Note. Even if that [N]ote was forgotten by Christine and omitted in the parties' settlement negotiations, Walt[er] knew of its existence as he continued to receive the monthly payment until the [N]ote was paid off. He argues that the proceeds of the [N]ote were subject to an agreement to trade the [N]ote proceeds for hay and cattle received by Christine, a contention she denies.

16.

No documents substantiate this alleged later agreement regarding the [N]ote proceeds. Walt[er] had a continuing duty to disclose and divide that asset, which he failed to do…. The court finds this to be a breach by Walt[er] of his fiduciary duties under [section] 721…."

The court awarded Christine attorney's fees and costs:

"Each party has incurred substantial attorney's fees in this matter. Walt[er] had incurred fees of approximately $60,000 prior to the hearing on this matter. Christine had incurred fees and costs of over $160,000. Each side was represented by able and experienced counsel, but the court finds that it was not necessary for Christine to hire two (2) attorneys to represent her in this matter. The Hatherley firm should not have had nine separate time keepers billing to the file. There were excessive charges for staff time for filing, file maintenance, processing e-mails, scanning, binder creation and attorneys working with staff…. [Walter's] responses to discovery were incomplete and unreasonably late. The production of documents was unorganized, duplicative and some tax documents appeared initially to have been redacted. The parties expended significant time and effort on routine discovery matters which should have involved minimal fees. This was mostly due to Walt[er]'s failure to properly respond to discovery.

"The court has also taken into account … fees related to the failure to properly disclose the Mendonca [N]ote …. Christine spent on appraisers for this motion as much as would have been required if the matter had proceeded to trial. This post-judgment motion, which was estimated for a half-day hearing, took seven days using all the court's available time outside of its normal calendar. Christine could have saved an enormous amount of fees and costs had she sought a bifurcated hearing dealing with the failure to comply with the disclosure requirements.

"The court has reviewed the fee declaration filed by Christine and considered the arguments and filings of the parties on this issue. The court has considered the incomes of the parties and finds there is a significant income disparity, though Christine also has substantial personal and household income. The court has considered the requirements of … [sections] 1101[, subdivision ](g), 6344,[16] 2030, 2032, 4320 and [Code of Civil Procedure section] 2023.030 and awards attorney's fees to Christine payable forthwith by Walt[er] in the amount of $80,000 and costs of $32,000."

---

**16** Walter requested a domestic violence restraining order, but withdrew the request at the time of the motion hearing.

17.

## VI. Christine's first motion after the January 8, 2013, order.

In March 2013, Christine filed a motion for the immediate payment of the January 8, 2013, attorney's fees and costs award. She argued that an order was appropriate because (1) Walter did not post an undertaking pursuant to Code of Civil Procedure section 917.1, subdivision (a)(1); and (2) notwithstanding an undertaking, a need-based award under sections 2030 and 2032 must be given during the pendency of an appeal. Walter countered that (1) the superior court only awarded costs under Code of Civil Procedure section 1021 et seq., the payment of which was automatically stayed on appeal; and (2) if the payment was not automatically stayed on appeal, he may nonetheless post an undertaking.

On May 6, 2013, the court ruled that an undertaking would stay the execution of a need-based attorney's fees and costs award:

> "This is not an award of routine costs under [Code of Civil Procedure s]ection 1021. As such the award is an order requiring the payment of money. Enforcement of the order can be stayed only by the posting of security. [(Code Civ. Proc., §] 917.1.[)] The amount of security is specified by statute at twice the amount of the order or if through a surety insurer, one and one-half times the ordered amount. [(*Id.*, subd. ](b).[)]

> "There appears to be no appellate decision directly on point regarding stay on appeal of attorney['s] fees awarded under [section] 2030. However, appellate courts have found that awards for payment of spousal and child support are orders for the payment of money to which [Code of Civil Procedure section] 917.1 has been held applicable. [(]*Smith v. Smith* (1927) 201 Cal. 217.[)] The court finds the subject attorney['s] fee[s] award analogous and that [Code of Civil Procedure section] 917.1 applies. Payment of the fees will be stayed upon posting the appropriate bond."

Walter did not appeal the May 6, 2013, order. On July 30, 2013, he filed an undertaking for appeal from the January 8, 2013, order.

## VII. Christine's second motion after the January 8, 2013, order.

In April 2013, Christine requested $70,000 in attorney's fees to defend against Walter's appeal from the January 8, 2013, order. In an income and expense declaration

18.

filed April 25, 2013, she again related that she owned and managed a flower shop, but did not earn a salary. Christine received average monthly payments of $725 from rental properties and $4,680.50 from royalty and overriding royalty interests. Her liquid assets and real property were worth $39,804.49 and $904,500, respectively. Christine estimated that her average monthly expenditures amounted to $10,620, approximately $2,000 of which went toward her legal expenses. Her husband, Douglas Rivers, earned $11,100 per month and paid for some of the household expenses. In addition to the two attorneys she hired for the set-aside motion, Christine hired Stephanie Borchers for the appeal. Borchers charged $350 per hour.[17] As of April 23, 2013, Christine paid them $296,841.09. $28,544.13 of that sum went to Borchers, who was still owed another $7,534.13. In order to finance her legal team, Christine utilized her personal savings as well as credit cards and home equity credit lines, incurring $176,491.16 in debt.

In a separate declaration filed April 25, 2013, Christine asserted:

"5.     I do not have the resources to pay for an appellate attorney in addition to paying back the credit card and other debt my husband and I have incurred in order to pay the previous approximately $300,000.00 in fees. I believe Walter has more than adequate financial resources to be able to pay both his own and my fees on appeal. [¶] … [¶]

"7.     As reflected in my Income and Expense Declaration, my floral shop business does not generate an income for me. Other than this business, I have not been employed outside the home since about 1982.

"8.     The properties that I own in California that are unencumbered generate only enough income to pay the mortgage on the 15 acres that were awarded to me in the [MSA].

"9.     I have exhausted my husband's savings in paying for this litigation…."

---

**17**     At some point, Borchers increased her rate to $365 per hour.

Christine's Schedule K-1 (Form 1120S) 2012 showed an ordinary business income of $19,701. Her and Douglas's 2012 Federal Depreciation Schedule listed a grand total depreciable basis of $457,936 with regard to oil and gas royalties and cattle.

Walter opposed the motion. In an income and expense declaration filed May 8, 2013, he related that he earned $8,268.18 per month as a farmer and $4,257.59 per month as an owner of oil working interests. Walter also received monthly payments of $39.59 from dividends and interests, $3,176.50 from rental properties, $794.50 from royalties, and $1,124.90 from Social Security. His assets were worth an estimated $1.4 million. Walter's monthly expenditures amounted to $4,447.17. In addition to the attorney he hired for the set-aside action (Harbottle), Walter hired Todd Baxter for the appeal. Baxter charged a $25,000 retainer fee. As of May 7, 2013, Walter paid Harbottle $105,817.78, which came from his earnings and a life insurance policy cash-out. He still owed her $38,881.

In a separate declaration dated May 7, 2013, Walter stated:

"2. I contend that I am unable to pay my own fees, let alone those incurred by Christine. In fact, I was forced to cash out my life insurance policy in order to pay some, but not all of the fees incurred to the Harbottle Law Firm in connection with the underlying Motion to Set Aside Judgment which gives rise to the appeal. I still owe the Harbottle Law Firm approximately $38,000. In addition, I now have to pay an appellate attorney [Todd Baxter]. Attorney Baxter advised that he charges a MANDATORY retainer of $25,000 which is normally due and payable up front. Although he agreed to allow me to pay $15,000 up front, and gave me two (2) months to pay the remaining $10,000, to date I have only been able to pay an additional $4,000. I do not have any stockpile of cash lying around with which to pay attorney[']s fees and I am no more able to pay attorney[']s fees than is Christine. In fact, Christine has far more money than I do available to her to pay attorney[']s fees…. [¶] … [¶]

"4. Unlike my income, which is speculative at best, and requires me to put most of the income generated back into the asset (I received working interests and orange groves in the divorce which must be maintained as active businesses in order to generate my income whatsoever and still involve a significant risk of loss …) Christine's assets do not require any

20.

outlay of cash. Instead, she receives a check each month or quarter without doing anything whatsoever and more importantly without putting any money back into her assets…. Christine is also remarried to a man who, according to … Christine's Income and Expense Declaration filed on or about April 23, 2013, … earns $11,000 per month…. [T]his is a stable and significant amount of income which is more than I earn. Moreover, I am forced to wait until the end of the year to determine my earnings, whereas Christine and Doug Rivers know exactly how much income they have to live on and which to pay their expenses, including attorney's fees, on a monthly basis…. [¶] … [¶]

"6. My only true predictable income and reliable income, is the income I receive from social security and in the form of rent…. [T]his amounts to only $4301.40 per month. The balance of my annual income is generated from oil wells and orange groves and is highly speculative and varies greatly from year to year. Moreover, because I am forced to leave the income generated from these assets in the asset for use as operating expense, the income earned cannot be determined with any degree of certainty until year's end.

"7. This court previously ordered me to pay $80,000 in attorney's fees and $32,000 in costs toward Christine's fees and costs incurred in connection with her underlying Motion to Set Aside Judgment …. [R]egardless of the correctness of the court's prior decision, my current income is vastly different from the income previously used by the court when ruling on Christine's request for fees and costs in December of 2012 based on 2011 income. [¶] … [¶]

"9. I was forced to plug two (2) dead wells in 2012 and even more of the wells are being plugged this year because they are dead…. [¶] … [¶]

"14. Christine reflects cash in the bank of $39,804.49, which is up over $17,304.49 from what she reflected she had in the bank on her December 7, 2012 Income and Expense Declaration, which means she is able to save money while at the same time complaining that she has no money to pay her own attorney[']s fees. Christine lists real and personal property totaling $904,500 but I believe her total assets are worth far more than this sum given that Doug has added her to all of his assets and she has also acquired other assets since our divorce …. Christine shows expenses … of only $10,620.00 per month. This includes charitable contributions of $1300.00 per month. If you take this amount out, Christine's monthly expenses, even with loans associated with payment of attorney[']s fees for this litigation, total $9320.00…. [I]t is clear that Christine and Doug have a[] combined income as reflected of $16,425.00 with combined necessary

21.

expenses of only $9320.00, leaving more than sufficient income to pay her own attorney[']s fees.  Indeed, it is clear that Christine has a far superior ability to pay fees and costs than I do…."

Walter's Form 1040 (2012) showed a business income of $25,283 and an adjusted gross income of $10,741.  His 2012 Federal Depreciation Schedule listed a grand total depreciable basis of $660,439[18] with regard to his oil working interest, rental home, grain and corn, lemons, and pasture.

On July 11, 2013, following a motion hearing, the court ordered Walter to pay Christine $50,000 in appellate attorney's fees, finding that (1) "there is a demonstrated disparity between the parties in access to funds to retain or maintain counsel"; (2) Walter "has or is reasonably likely to have the ability to pay for legal representation for both parties"; and (3) Christine's fees "are reasonable and necessary."  The court detailed:

> "24.  Under the analysis required by … sections 2030 and 2032, it appears [Christine] had annual taxable income from the flower shop of $19,701 on the last tax return, … $1,641[.75] per month.  The Court finds that that income is available to her.  [Christine] has royalty income of between $4,500 and $4,700 per month.  She also has rent of about $7[25] per month.  Her Income and Expense Declaration reflects monthly expenses of $10,620 which includes approximately $2,000 per month in payments toward attorney[']s fees.  She also claimed significant depreciation of $457,000 on her tax returns.  She has more than $175,000 in debt from her attorney's fees to date pursuant to her Income and Expense Declaration. The Court finds she has new spouse income, depending on how you analyze it, from $11,000 to $12,500 which is available, but the Court is not going to consider all of that income available for purposes of the appeal. The Court does not believe it is Mr. Rivers' job to fund this appeal.  And, in fact, the fees far out stretch even his ability to pay.  [¶] … [¶]
>
> "26.  [Walter's] 2012 tax returns show adjusted gross income of $10,741.  The depreciation deductions from all his businesses are $673,126. The Court finds much of this money is available to him.  With regards to whether he has this income or he invested it, the Court notes that [Walter] manages consistently to turn large incomes to minimal or negative taxable

***

**18**     This figure was the difference between $673,126 (the grand total cost) and $12,687 (a prior depreciation deduction under Int.Rev. Code, § 179).

incomes. His gross income or working interest on his business return is $498,000,[19] but net taxable income in those interests was $25,2[8]3. Every year he places significant capital at risk for absolutely minimal returns. In this case, his returns for 2012 were less th[a]n he could have gotten sitting at home in an easy chair, chasing his social security check. The court finds that the only reason a person would put millions of dollars of capital at risk in what are often very risky businesses, such as the oil and gas business, farming and citrus, is because the returns are actually substantial. The Court finds that a lot of people underestimate [Walter]. The Court does not. The Court finds that [Walter] is a successful investor, a bright man, and that he makes money on his investments. The Court believes that [Walter] puts his capital at risk because he expects to, and does, earn a substantial return on that capital.

"27. The Court finds that the Income and Expense Declaration for [Walter] doesn't match his tax return directly. The Income and Expense Declaration shows expenses for [Walter] of $4,447.17 a month. It reflects income of $8,268.68 a month. So, even by his own accounting, [Walter's] income exceeds his expenses substantially, though the Court does not believe that the income reflected on the taxes is the factual income. The Court believes [Walter's] income to be substantially greater than reflected on his tax return. The Court is also aware of and taking into account the approximately $800,000.00 [Walter] had from the sale of oil interests in 2011 and is taking into account that those assets should be and are earning significant income in returns." (Boldface omitted.)

In view of section 4320, the court found the following factors particularly relevant: (1) Christine's job skills were "essentially derived from" helping Walter with his oil and gas businesses; (2) Walter's earning capacity far exceeded Christine's; (3) Walter "maintained most of the profitable and available community assets and earn[ed] … substantially more income than what may be reflected in the tax returns"; (4) Christine sustained "significantly greater financial hardships," given that she "incurred about $300,000 in fees and costs over the last hearing," "retain[ed] less valuable assets and less income in properties," and "spent money reinvesting and increasing them"; (5) Christine owned and managed a flower shop that did not generate much income and did not seek

---

**19** It is unclear from where the court derived this figure, though Walter's attorney apparently conceded that his client's gross income totaled approximately $600,000.

further education and/or training; and (6) Walter's tax returns "d[id] not accurately indicate his income and d[id] not indicate funds available to him." (Boldface omitted.)

On July 22, 2013, Walter filed an appeal from the July 11, 2013, order. On July 30, 2013, he posted an undertaking for appeal from that order pursuant to Code of Civil Procedure section 917.1.

## VIII. Christine's third and fourth motions after the January 8, 2013, order.

On September 4, 2013, Christine filed two more motions. First, she requested the immediate payment of the July 11, 2013, appellate attorney's fees award and the release of Walter's bond. Christine reargued that, notwithstanding an undertaking filed pursuant to Code of Civil Procedure section 917.1, subdivision (a)(1), a need-based award under sections 2030 and 2032 must be paid during the pendency of an appeal. Second, Christine requested $13,639 in costs for the enforcement of the January 8, 2013, order and $20,000 in attorney's fees to petition the Fifth Appellate District for writ relief if her request for the immediate payment of the July 11, 2013, appellate attorney's fees award was rejected.[20]

In an income and expense declaration dated August 18, 2013, Christine related that her average monthly payments from rental properties and royalty interests were substantially the same while her average monthly expenditures decreased to $10,553.20. $1,843.60 of these expenditures went toward her legal expenses. Also, the value of Christine's liquid assets increased to $45,173.23. As of September 4, 2013, she paid her attorneys $318,094.22. $59,797.26 of that sum went to Borchers, who was still owed $14,280.30. Christine incurred $214,822.41 in debt to finance her legal team.

Walter opposed both motions. First, he asserted that the court could not order the immediate payment of the July 11, 2013, appellate attorney's fees award because he posted an undertaking. Second, Walter argued that an award of costs associated with the

---

[20]     Borchers provided the bases for these amounts in a separate declaration.

24.

enforcement of the January 8, 2013, order was not reasonable or necessary because Christine "knew Walt[er] had filed an appeal and that his attorneys were working on getting a bond posted." (Boldface omitted.) Finally, he maintained that an award of attorney's fees to pursue extraordinary writ relief "is patently unfair to Walt[er] and does not constitute any effort to level the playing field to allow a spouse to pay attorney['s] fee[s], experts and the cost of litigation as required under the [*In re Marriage of*] *Tharp* [(2010) 188 Cal.App.4th 1295 (*Tharp*)] holding or the other cases which support the awarding of fees and costs under section[s] 2030 and 2032."

In an income and expense declaration filed September 24, 2013, Walter related that his monthly earnings as a farmer and owner of oil working interests decreased to $7,801.34 and $2,665.85, respectively. His monthly payments from dividends and interests, rental properties, royalties, and Social Security, his monthly expenditures, and the value of his assets remained the same. As of September 23, 2013, Walter paid Harbottle $136,109.59, which came from his earnings. He still owed her $33,988.35.

At the September 27, 2013, motion hearing, the court indicated that it would (1) deny Christine's request for immediate payment of the July 11, 2013, award; (2) grant Christine's request for costs associated with the collection of the January 8, 2013, award, albeit a reduced amount; and (3) grant Christine's request for $20,000 in attorney's fees to pursue extraordinary writ relief. It specified:

> "I don't really think I have the jurisdiction to order immediate payment of the [appellate attorney's] fees on appeal. I think I made my ruling fairly clear that I think that it's not an award of a coin toss that could be stayed, be forced into the appropriate bond. The bonds have been filed, both of those appeals, and the appeals filed and proceeding."

> "… [C]onsider[ing] the issue of fees regarding collection[,] … [¶] … [¶] … I have reviewed [Borchers's] billing statements, which on the whole I don't find unreasonable…. [¶] … [F]undamentally[, Borchers] had waited a long time …. I mean, … [she] could have commenced levying in January and waited on the ruling for the fee motion, waited on another motion, essentially after the bonding issue.

25.

"I don't believe all of the fees were necessary. I think in looking through them, specifically I thought there were too many interoffice conferences. There was significant money spent on out-of-state levy procedures … and then an hour-and-a-half just reviewing and redacting bills. There were … some fees … that were unrelated to the collection efforts, like two-and-a-half hours for preparation of order after hearing, a couple hours spent on research. [¶] I don't think collection procedures are really a research matter. [¶] … [¶]

"… I do find that the fees related to the preparation of the motion are recoverable. I think many of the fees were reasonable. I've previously made very expansive findings on [section] 2030 issues, [section] 2032, [section] 4320. I certainly reiterate and adopt those findings from May 17th of this year and January 8th of this year. But I am going to award fees for the motion based on review of those matters in the amount of $10,000.

"That brings us to the issues for the writ and I think … both [parties] certainly present a very eloquent and reasoned approach for [their] positions and quite frankly I don't know the answer to that. [¶] I think … that Tharp is my authority here, and like the Tharp case it's a complex case, significant earning disparity and significant income disparity. That appellate case looked at [section] 2030 and the policy of leveling the playing field.

"I think here [Christine] certainly has been frustrated in her ability to get to appeal and prosecute her own appeal, unable to collect the fees on the first matter …. [¶] And, again, I'm not saying that [Walter's] conduct is unreasonable because it's entirely consistent with my prior rulings so I cannot say that what [Walter] ha[s] done is in any way improper. But in looking at these income and expense declarations, [Christine] had to spend a significant amount, … over $300,000 in attorney['s] fees, has borrowed that money, has mortgaged property, has depleted her savings. [Walter] has paid, according to the declaration he filed, about $136,000 just from what he made in his earnings, which again, I think, points to the disparity to the access of funds in this case. [¶] … [¶]

"I've engaged in extensive analysis of this income and asset information, the tax returns in May, and I think I know the parties' taxes well enough, and I don't feel that [Christine's] income and expense declaration is either really inaccurate or an attempt to mislead the Court in any way. [¶] … [¶]

"… I think we need directions from the appellate court. And I have two lawyers coming in here and arguing perfectly reasonable positions

26.

supported by the statutes and the case law that they cite. I need someone higher up the food chain to give me some direction, and that's what I'm asking for here, and that's why I think we need to have some fees paid on appeal to level that playing field and allow the matter to proceed one way or the other.

"So I am going to order further fees on appeal payable by [Walter] to [Christine] in the amount of $20,000 in addition to the $10,000 ordered for collection efforts…."

Harbottle and Baxter pointed out that the court did not establish Walter's actual income. The court responded:

"I made extensive findings about his tax returns, concluding his depreciation is largely available to him and the fact that, based on the huge amount of income that comes and goes from his various businesses and his willingness to put huge amounts of capital at risk, that his tax returns are in no way a reflection of his income. In fact, I think I pointed out the last time, based on his tax return, he would be better off at home, in front of the TV, living on Social Security and not putting all of these millions of dollars in assets at risk in risky businesses. [¶] … [¶]

"…. You're not going to hear me say he makes $324,000.18 because I don't know what he makes. I'm not an accountant, I have never seen a forensic accountant. I have looked at enough tax returns. And I think I made very extensive findings on the issues in May. [¶] … [¶]

"… I think [Walter's] income is in the hundred thousands annually. I think it effectively pays -- well, based on his 2012 returns virtually is certainly a reflection, based on the testimony heard at the trial, the way his accountant pays the tax returns. I think I made findings to that effect in my initial ruling.

"The fact that he got this money from the sale of the petroleum interest and thought he can somehow defer these into some escrow account and then realized or was pointed out to him that he couldn't but his accountant still files those tax returns which, you know, I don't know how under any conceivable set of circumstances an accountant could have done in good conscience. [¶] … [¶]

"… I'm not saying those funds are available to him … as I recall they were invested into real estate assets. I'm not requiring him to sell those assets.

27.

"But as I indicated then I think these are people who, based on tax returns, during their marriage kept losing money every year, hundreds of thousands dollars every year, and yet kept acquiring more assets every year. I never learned that trick and [Walter] apparently has.

"So, as I indicated, I'm going to adopt my prior findings regarding [Walter's] income. I think the financial situation of the parties is substantially unchanged since the last ruling.

"I reiterate my findings, indicate this award in fees is appropriate in this case. I think it is a vast income disparity and I think he has the ability to pay that, despite his representations to the Court to the contrary."

On October 24, 2013, the superior court issued the following order:

"10.     [Christine] in her Motion for Immediate Payment of Appellate Attorney['s] Fees and Costs Previously Awarded and to Order Bond Released, takes the position that … sections 2030 and 2032 prohibit [Walter] from bonding the appellate attorney['s] fees awarded by the Court on July 11, 2013, and asks this Court to order the immediate payment of the attorney['s] fees awarded for the appeal and to release the bond. [Walter] takes the position that the award of attorney['s] fees is an order for the payment of money that can be bonded in accordance with [Code of Civil Procedure s]ection 917.1.

"11.     After further consideration and argument by the parties, the Court denies the Motion for Immediate Payment of Appellate Attorney['s] Fees and Costs Previously Awarded and to Order Bond Released. The Court does not believe it has the jurisdiction to order immediate payment of the attorney['s] fees ordered on appeal and to order release of the bond in light of the fact an appeal and undertaking have been filed in accordance with [Code of Civil Procedure s]ection 917.1

"12.     As to the Motion for Costs in Enforcing Order And For Additional Attorney['s] Fees to Pursue Immediate Appellate Relief, If Necessary, the Court grants this motion. The Court awards [Christine] $10,000 for attorney['s] fees and costs incurred in enforcing the Court's January 8, 2013 order awarding attorney['s] fees and costs. The Court awards the $10,000 under … [s]ection[s] 2030 and 2032 and adopts and incorporates by reference the Court's conclusions and findings as detailed in its July 11, 2013 Order awarding need based fees for the appellate attorney['s] fees, as well as the Court's conclusions and findings detailed on the record at the hearing on September 27, 2013, to support its award herein.

28.

"13.    As part of the Motion for Costs in Enforcing Order And For Additional Attorney['s] Fees to Pursue Immediate Appellate Relief, If Necessary, [Christine] requests that the Court award her $20,000 in need based fees to pursue a writ before the Fifth District Court of Appeal in the event the Court denied the Motion for Immediate Payment of Appellate Attorney['s] Fees and Costs Previously Awarded and to Order Bond Released.  As noted above, the Court denies the Motion for Immediate Payment of Appellate fees.  The Court does award $20,000 to allow [Christine] to pursue a Petition for Writ of Mandate with respect to the denial of this Motion to obtain an appellate answer to the issue of whether … [s]ection 2030 need based fee awards of appellate attorney['s] fees can be stayed on appeal by the posting of an undertaking pursuant to [Code of Civil Procedure s]ection 917.1.  The Court makes the award of $20,000 under … [s]ection[s] 2030 and 2032 and adopts and incorporates by reference the Court's conclusions and findings as detailed in its July 11, 2013 Order awarding need based fees for the appellate attorney['s] fees, as well as the Court's conclusions and findings detailed on the record at the hearing on September 27, 2013, to support its award herein."

On November 25, 2013, Walter filed an appeal from the October 24, 2013, order. On January 14, 2014, he posted an undertaking pursuant to Code of Civil Procedure section 917.1.

## DISCUSSION

### The Set Aside

### I.    Overview of the disclosure requirements (§ 2100 et seq.).

"It is the policy of the State of California … to marshal, preserve, and protect community and quasi-community assets and liabilities that exist at the date of separation so as to avoid dissipation of the community estate before distribution … and … to achieve a division of community and quasi-community assets and liabilities on the dissolution or nullity of marriage or legal separation of the parties as provided under California law."  (§ 2100, subd. (a); see § 2120, subd. (a).)  "Sound public policy further favors the reduction of the adversarial nature of marital dissolution and the attendant costs by fostering full disclosure and cooperative discovery."  (§ 2100, subd. (b).)  "In order to promote this public policy, a full and accurate disclosure of all assets and

liabilities in which one or both parties have or may have an interest must be made in the early stages of a proceeding for dissolution of marriage or legal separation of the parties, regardless of the characterization as community or separate, together with a disclosure of all income and expenses of the parties. Moreover, each party has a continuing duty to immediately, fully, and accurately update and augment that disclosure to the extent there have been any material changes so that at the time the parties enter into an agreement for the resolution of any of these issues, or at the time of trial on these issues, each party will have a full and complete knowledge of the relevant underlying facts." (*Id.*, subd. (c); see § 2120, subd. (a).)

Parties to a marital dissolution proceeding are in a fiduciary relationship. (See §§ 2100, subd. (c), 2102; see also *In re Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334, 1344 ["The formulation of a[n] [MSA] is not an ordinary business transaction, resulting from an arm's-length negotiation between adversaries. Rather, it is the result of negotiations between fiduciaries required to openly share information."].) "From the date of separation to the date of the distribution of the community or quasi-community asset or liability in question, each party is subject to the standards provided in [s]ection 721,[21] as to all activities that affect the assets and liabilities of the other party, including, but not limited to, … [¶] … [t]he accurate and complete disclosure of all assets and liabilities in which the party has or may have an interest or obligation and all current earnings, accumulations, and expenses, including an immediate, full, and accurate update or augmentation to the extent there have been any material changes." (§ 2102, subd. (a)(1); see *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th

---

**21**     Section 721, subdivision (b) reads, in relevant part:

> "[I]n transactions between themselves, spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other."

30.

1252, 1270 ["[S]ection 2100 makes clear that these fiduciary obligations of disclosure and accounting continue to bind spouses after separation until final distribution of assets."].)**22**

## II.     The October 26, 2011, set-aside motion was not time-barred because Christine discovered Walter's failure to disclose the Mendonca Note less than a year before she filed the motion.

"Section 2122 sets out the exclusive grounds and time limits for an action or motion to set aside a marital dissolution judgment." (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 684.) In particular, subdivision (f) reads:

> "Failure to comply with the disclosure requirements of Chapter 9 (commencing with [s]ection 2100). An action or motion based on failure to comply with the disclosure requirements shall be brought within one year after the date on which the complaining party either discovered, or should have discovered, the failure to comply." (§ 2122.)

"[A] limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the facts essential to h[er] claim." (*Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 897, italics omitted; see *Rubenstein v. Rubenstein*, *supra*, 81 Cal.App.4th at p. 1149, italics omitted ["[T]he statute of limitations under [former] section 2122 accrues as of the date the plaintiff either discovered or should have discovered the facts constituting the fraud or perjury …."].) The Supreme Court explained:

> "[T]he plaintiff discovers the cause of action when [s]he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if [s]he lacks knowledge thereof—when, simply put, [s]he at least 'suspects … that someone has done something wrong' to h[er] [citation], 'wrong' being

---

**22**     "[A]s *part* of [the] statutory scheme designed to ensure that parties to a dissolution action meet their fiduciary duty to make full disclosure of their assets and liabilities" (*Elden v. Superior Court* (1997) 53 Cal.App.4th 1497, 1507, italics added), sections 2104 and 2105 impose "an affirmative duty to exchange both a preliminary and a final declaration of disclosure … prior to judgment being entered" (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 331). (Accord, § 2103.)

31.

used, not in any technical sense, but rather in accordance with its 'lay understanding' [citation]. [Sh]e has reason to discover the cause of action when [s]he has reason at least to suspect a factual basis for its elements. [Citation.] [Sh]e has reason to suspect when [s]he has ""'"notice or information of circumstances to put a reasonable person *on inquiry*"'"" [citation]; [s]he need not know the 'specific "facts" necessary to establish' the cause of action; … but, within the applicable limitations period, [s]he must indeed seek to learn the facts necessary to bring the cause of action in the first place—[s]he 'cannot wait for' them 'to find' h[er] and 'sit on' h[er] 'rights'; [s]he 'must go find' them h[er]self if [s]he can and 'file suit' if [s]he does [citation]." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397-398, fns. omitted.)

"However, a fiduciary has a duty to make a full and fair disclosure of all facts which materially affect the rights and interest of the parties, and, where a fiduciary relationship exists, facts which would ordinarily require investigation may not excite suspicion." (*Bennett v. Hibernia Bank* (1956) 47 Cal.2d 540, 559-560, citing *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 440; see *Hobbs v. Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 202 ["[A] plaintiff is entitled to rely upon the assumption that h[er] fiduciary is acting on h[er] behalf."].)

"Resolution of [a] statute of limitations issue is normally a question of fact" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810) and a "trial court's finding on the accrual of a cause of action for statute of limitations is upheld on appeal if supported by substantial evidence" (*Institoris v. City of Los Angeles* (1989) 210 Cal.App.3d 10, 17). (See *Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 200 ["When applying the substantial evidence test, 'the power of the appellate court begins and ends with a determination whether there is any substantial evidence, contradicted or uncontradicted, which supports the finding.'"].)

We conclude the October 26, 2011, set-aside motion was timely filed. Christine alleged that Walter did not identify the Mendonca Note as an asset. She was unaware of this exclusion until her attorney came across the Note during a public records search in April 2011. (Cf. *In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1482-1483,

32.

1487-1488 [ex-husband's failure to disclose purchase of $1 million bond and existence of 401(k) account on schedule of assets and debts violated § 2102, subd. (a)(1)].) Christine reiterated these points at the motion hearing, emphasizing that she trusted Walter, who normally handled business and financial matters. Walter acknowledged that the MSA did not mention the Mendonca Note, but argued that Christine participated in the original real estate transaction with the Mendoncas; Christine promptly notified him about the Note's exclusion from the MSA; and he and Christine entered into a separate agreement on the Note after entry of the November 6, 2009, dissolution judgment. He pointed out that the Mendoncas made monthly payments since 2003 and the parties' annual tax returns reported interest on the Note.

In its January 8, 2013, statement of decision, the trial court concluded that Walter breached his fiduciary duty by failing to disclose the Mendonca Note.[23] In doing so, it necessarily credited Christine's account that (1) Walter never disclosed the Note to her; (2) she relied on Walter's warranty that he "d[id] not own any property of any kind, other than the property listed in th[e MSA]"; and (3) she did not recall the Note until her attorney located it in his April 2011 records search. (See *Consolidated Irrigation Dist. v. City of Selma*, *supra*, 204 Cal.App.4th at p. 201 ["The testimony of a single witness, even if that witness is a party to the case, may constitute substantial evidence."], citing *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614; *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968 ["'[N]either conflicts in the evidence nor "'testimony which is subject to justifiable suspicion … justif[ies] the reversal of a judgment, for it is the

---

**23** At oral argument, Walter proposed that the Mendonca Note was always an omitted asset that would be apportioned at a later date. This assertion, which was neither developed nor substantiated in the opening brief, was contradicted by the court's findings that "Walt[er] had a continuing duty [under section 721] to disclose and divide th[e Mendonca Note], which he failed to do" and "[e]ven if th[e N]ote was forgotten by Christine and omitted in the parties' settlement negotiations, Walt[er] knew of its existence as he continued to receive the monthly payment until the [N]ote was paid off."

33.

exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'"'"].)[24]

### III. Walter's failure to disclose the Mendonca Note constituted prejudicial error.

Section 2107, subdivision (d) states, in relevant part:

"[I]f a court enters a judgment when the parties have failed to comply with all disclosure requirements of this chapter, the court shall set aside the judgment. The failure to comply with the disclosure requirements does not constitute harmless error."

As Division Three of the Fourth Appellate District correctly observed, however, "[t]o the degree … that section 2107, subdivision (d) is read for the proposition that a judgment must be set aside … solely because of … [non]disclosure, it is not consistent with our state's Constitution." (*In re Marriage of Steiner & Hosseini* (2004) 117 Cal.App.4th 519,

---

[24] Alternatively, Walter argues that Christine "invited … error and should be estopped from being permitted to set aside the Judgment" because she "represented to the court on at least two different occasions … that she complied with … section 2104 and completed and exchanged her preliminary declarations of disclosure."

At least one case has expressed that the doctrine of invited error prohibits a party from basing a set-aside motion on the party's *own* failure to provide a preliminary disclosure declaration. (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1576; cf. *Evans*, *supra*, 229 Cal.App.4th at p. 390, fn. 11, quoting Civ. Code, § 3517 [William's argument that his own failure to serve a final disclosure declaration rendered the pre-divorce agreement unenforceable violated maxim of jurisprudence that "'[n]o one can take advantage of his own wrong'"]; *Woolsey*, *supra*, 220 Cal.App.4th at p. 894 ["[Clark] may not be heard to complain about his own failure to serve the final financial disclosure…. Allowing 'a *non*-complying party [to] unilaterally undo a judgment after trial when he or she would have to comply to obtain disclosure before trial [would] create[] a most perverse set of incentives: … [A] party could *deliberately* not comply with disclosure requirements, keep mum, see if the trial results in an acceptable judgment, and then have the opportunity to obtain a better result by pulling the non-disclosure card out of his or her sleeve on appeal or new trial motion.'"].)

The doctrine does not apply here. Although Christine herself did not fully comply with the disclosure requirements, she based her set-aside motion on *Walter's* nondisclosures.

527 (*Steiner*); see Cal. Const., art. VI, § 13 ["No judgment shall be set aside, … in any cause, … for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."].) "Additionally, to the degree that section 2107, subdivision (d) is read for that proposition, it is also ... inconsistent with at least one other statute which is part of the same scheme …." (*Steiner*, *supra*, at p. 527; see § 2121, subd. (b) ["In all proceedings under this chapter, before granting relief, the court shall find that the facts alleged as the grounds for relief materially affected the original outcome and that the moving party would materially benefit from the granting of the relief."].) In view of "established canon[s] … that statutes must be construed … to render them constitutional" (*Steiner*, *supra*, at p. 528) and "[s]tatutory schemes must … be read as a whole, harmonizing their provisions" (*ibid.*), "the statement in section 2107, subdivision (d) that a failure to comply with the … disclosure requirements is not 'harmless error' must give way to the Constitution and the balance of the legislative scheme" (*ibid.*). Thus, a dissolution judgment cannot be set aside unless "some portion of the judgment [was] materially affected by the nondisclosure." (*Ibid.*; see *In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, 92 (*Kieturakis*) [showing of prejudice required notwithstanding statutory language].)

Normally, an appellate court "review[s] the trial court's decision in ruling on the motion to set aside the judgment and [MSA] to determine if the trial court abused its discretion." (*In re Marriage of Brewer & Federici*, *supra*, 93 Cal.App.4th at p. 1346; see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 ["A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.'"]; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 ["'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered.'"].) Ultimately, "[w]e are required to uphold [a discretionary] ruling if it is

correct on any basis, regardless of whether such basis was actually invoked." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32, citing *Davey v. Southern Pacific Co.*, *supra*, 116 Cal. at p. 329; see *ante*, fn. 6; accord, *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.)

In its January 8, 2013, statement of decision, the superior court found that "the grounds for relief materially affected the outcome and that [Christine] would benefit from granting of the [requested] relief …." Given our disposition on the statute of limitation issue (see *ante*, at pp. 31-34), we focus exclusively on Walter's nondisclosure of the Mendonca Note rather than his failure to provide a preliminary disclosure declaration, the ruling's "key factor." Nonetheless, we are not compelled to reverse the ruling. (See *In re Marriage of Burgess*, *supra*, 13 Cal.4th at p. 32.) As previously mentioned, Paragraph X. of the MSA assured that neither Walter nor Christine "own[ed] any property of any kind, other than the property listed in [Paragraph IV.]." The court found, however, that the Mendonca Note was "omitted in the parties' settlement negotiations" and that Walter "knew of [the Note's] existence [and] continued to receive … monthly payment[s] until the [N]ote was paid off." In addition, by its findings, the court necessarily credited Christine's account that she relied on Paragraph X. and did not discover the Mendonca Note's exclusion from the MSA until her attorney located it in his 2011 records search. It is neither irrational nor arbitrary to conclude that Walter's breach of fiduciary duty "materially affected the original outcome" (§ 2121, subd. (b)): no reasonable person would have signed the extant MSA had he or she been informed about an undisclosed, $200,000 promissory note beforehand. Furthermore, the court found—in light of Hupp's, Luhr's, and Simon's opinions—that Walter "obtained more valuable assets" "[b]y retaining most of the active farming entities and working petroleum interests …." (See § 2120, subd. (b) ["It occasionally happens that the division of property …, whether made as a result of agreement or trial, is inequitable when made due to the nondisclosure or other misconduct of one of the parties."].) Given that the assets were distributed

asymmetrically, it is neither irrational nor arbitrary to conclude that Christine "would materially benefit from the granting of [set-aside] relief." (§ 2121, subd. (b).)

**IV. The superior court did not abuse its discretion when it barred Michner as a witness.**

"Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion." (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317; accord, *Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111.) A court abuses its discretion when its ruling "is 'so irrational or arbitrary that no reasonable person could agree with it'" (*Sargon Enterprises, Inc. v. University of Southern California*, *supra*, 55 Cal.4th at p. 773) or "'exceeds the bounds of reason, all of the circumstances before it being considered'" (*Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 566).

Mediation refers to "a process in which a neutral person … facilitate[s] communication between the disputants to assist them in reaching a mutually acceptable agreement." (Code Civ. Proc., § 1775.1, subd. (a); Evid. Code, § 1115, subd. (a).) "In appropriate cases mediation provides parties with a simplified and economical procedure for obtaining prompt and equitable resolution of their disputes and a greater opportunity to participate directly in resolving these disputes. Mediation may also assist to reduce the backlog of cases burdening the judicial system. It is in the public interest for mediation to be encouraged and used where appropriate by the courts." (Code Civ. Proc., § 1775, subd. (c); accord, *Rojas v. Superior Court* (2004) 33 Cal.4th 407, 415.)

"One of the fundamental ways the Legislature has sought to encourage mediation is by enacting several 'mediation confidentiality provisions'" (*Rojas v. Superior Court*, *supra*, 33 Cal.4th at p. 415), which "permit[] the parties to frankly exchange views, without fear that disclosures might be used against them in later proceedings" (*Fair v. Bakhtiari* (2006) 40 Cal.4th 189, 194). "To carry out the purpose of encouraging mediation by ensuring confidentiality, the statutory scheme, which includes [Evidence

37.

Code] sections 703.5, 1119, and 1121, unqualifiedly bars disclosure of communications made during mediation absent an express statutory exception." [25] (*Foxgate Homeowners' Assn. v. Bramalea California, Inc.* (2001) 26 Cal.4th 1, 15, fn. omitted.) The Supreme Court explained:

> "The mediation confidentiality statutes govern only the narrow category of mediation-related communications, but they apply broadly within that category, and are designed to provide maximum protection for the privacy of communications in the mediation context. A principal purpose is to assure prospective participants that their interests will not be damaged, first, by attempting this alternative means of resolution, and then, once mediation is chosen, by making and communicating the candid disclosures and assessments that are most likely to produce a fair and reasonable mediation settlement." (*Cassel v. Superior Court* (2011) 51 Cal.4th 113, 132-133.)

A mediator is "[in]competent to testify, in any subsequent civil proceeding, as to any statement, conduct, decision, or ruling, occurring at or in conjunction with the [mediation]" (Evid. Code, § 703.5) and "may [not] submit to a court or other adjudicative body … any report, assessment, evaluation, recommendation, or finding of any kind … concerning a mediation conducted by the mediator" (*id.*, § 1121). Moreover, Evidence Code section 1119 "prohibits any person, mediator and participants alike, from revealing any written or oral communication made during mediation." (*Foxgate Homeowners' Assn. v. Bramalea California, Inc.*, *supra*, 26 Cal.4th at p. 13.) This provision specifies:

> "(a) No evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation … is admissible or subject to discovery, and disclosure of the evidence shall not be compelled, in any … civil action ….
>
> "(b) No writing … that is prepared for the purpose of, in the course of, or pursuant to, a mediation … is admissible or subject to discovery, and disclosure of the writing shall not be compelled, in any … civil action ….

---

**25**  "On limited occasions, courts have crafted exceptions to mediation confidentiality and compelled mediators to testify in civil actions." (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 582 (*Simmons*).) However, in his opening brief, Walter specifies that he "is not seeking the creation of a judicial exception to mediation confidentiality."

"(c) All communications, negotiations, or settlement discussions by and between participants in the course of a mediation … shall remain confidential."  (Evid. Code, § 1119.)

"Anything said, any admission made, or any writing that is inadmissible, protected from disclosure, and confidential … before a mediation ends, shall remain inadmissible, protected from disclosure, and confidential to the same extent after the mediation ends."  (Evid. Code, § 1126; accord, *Simmons*, *supra*, 44 Cal.4th at p. 580.)

"[A] court or other adjudicative body may not consider … any report, assessment, evaluation, recommendation, or finding of any kind by the mediator concerning a mediation conducted by the mediator, … unless all parties to the mediation expressly agree otherwise in writing, or orally in accordance with [Evidence Code s]ection 1118.[26]"  (Evid. Code, § 1121; see *Kieturakis*, *supra*, 138 Cal.App.4th at pp. 85-86 ["This '"supermajority" requirement … effectively creates a "super privilege"—impenetrable by public policies favoring disclosure …."'].)  Likewise, "[a] communication or a writing … that is made or prepared for the purpose of, or in the course of, or pursuant to, a mediation … is not made inadmissible, or protected from disclosure, … if …  [¶] … [a]ll persons who conduct or otherwise participate in the mediation expressly agree in writing, or orally in accordance with [Evidence Code

---

**26** Evidence Code section 1118 reads:

"An oral agreement … means an oral agreement that satisfies all of the following conditions:

"(a) The oral agreement is recorded by a court reporter or reliable means of audio recording.

"(b) The terms of the oral agreement are recited on the record in the presence of the parties and the mediator, and the parties express on the record that they agree to the terms recited.

"(c) The parties to the oral agreement expressly state on the record that the agreement is enforceable or binding, or words to that effect.

"(d) The recording is reduced to writing and the writing is signed by the parties within 72 hours after it is recorded."

s]ection 1118, to disclosure of the communication, document, or writing[, or]  [¶] …
[t]he communication, document, or writing was prepared by or on behalf of fewer than all
the mediation participants, those participants expressly agree in writing, or orally in
accordance with [Evidence Code s]ection 1118, to its disclosure, and the communication,
document, or writing does not disclose anything said or done or any admission made in
the course of the mediation."  (Evid. Code, § 1122, subd. (a); see *Kieturakis*, *supra*, at
pp. 85-86.)

We conclude the court did not abuse its discretion when it barred Michner as a
witness.  Walter wanted Michner to testify about matters related to the parties' mediation.
Such testimony—as recognized by Michner—was clearly prohibited by the mediation
privilege, which Christine refused to waive.  (See *Simmons*, *supra*, 44 Cal.4th at p. 588
["The Legislature chose to promote mediation by ensuring confidentiality rather than
adopt a scheme to ensure good behavior in the mediation and litigation process."]; *Kurtin
v. Elieff* (2013) 215 Cal.App.4th 455, 470 ["The California Supreme Court has clearly
signaled the policy behind the mediation privilege is so strong that California law is
willing to countenance the 'high price' of the loss of relevant evidence to protect the
privilege."]; *Wimsatt v. Superior Court* (2007) 152 Cal.App.4th 137, 142 ["The Supreme
Court has held that the mediation statutes are to be broadly construed to effectuate the
legislative intent, even if there are conflicting public policies and even if the equities in a
particular case suggest a contrary result."].)

### Attorney's Fees and Costs

### I.    Standard of review of award of attorney's fees and costs.

On appeal, we review an award of attorney's fees and costs under sections 2030
and 2032 for an abuse of discretion.  (*In re Marriage of Sorge* (2012) 202 Cal.App.4th
626, 662.)  We will not reverse a ruling on a motion for fees and costs "absent a showing
that no judge could reasonably have made the order, considering all of the evidence

40.

viewed most favorably in support of the order." (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 975; accord, *In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768-769.) "'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 146, quoting *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.)

"When applying the substantial evidence test, 'the power of the appellate court begins and ends with a determination whether there is any substantial evidence,[27] contradicted or uncontradicted, which supports the finding.' [Citation.]" (*Consolidated Irrigation Dist. v. City of Selma*, *supra*, 204 Cal.App.4th at pp. 200-201.) "'"We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." [Citation.]' [Citations.]" (*Lenk v. Total-Western, Inc.*, *supra*, 89 Cal.App.4th at p. 968.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) A finding will be upheld if it is supported by substantial evidence, even if substantial evidence to the contrary also exists and the lower court might have rendered a different result had it believed this evidence. (*Ibid.*)

De novo review of an award of attorney's fees is warranted "'"where the determination of whether the criteria for an award of attorney['s] fees and costs … have been satisfied amounts to statutory construction and a question of law."'"

---

**27**     Substantial evidence is reasonable, credible, of solid value, and of ponderable legal significance. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

41.

(*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213, quoting *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.)

As to a lower court's application of the law to the facts, "'[d]iscretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered.'" (*Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 566; see *Sargon Enterprises, Inc. v. University of Southern California*, *supra*, 55 Cal.4th at p. 773 ["A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.'"].) However, while the court "has considerable latitude in fashioning or denying an attorney['s] fees award, its decision must reflect an exercise of discretion and a consideration of the appropriate factors as set forth in … sections 2030 and 2032." (*Tharp*, *supra*, 188 Cal.App.4th at p. 1313; see *Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 254 (*Alan S.*) ["While no particular language is required in an order awarding attorney['s] fees under sections 2030 and 2032, the record (including, but not limited to, the order itself), must reflect an actual exercise of discretion and a consideration of the statutory factors in the exercise of that discretion."].)

## II.    Overview of sections 2030 and 2032.

"In a proceeding for dissolution of marriage, … and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation … to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party … to pay to the other party … whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." (§ 2030, subd. (a)(1).) An award of attorney's fees and costs under section 2030 must be "just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).) "In determining what is just and reasonable under the relative circumstances, the court shall take into

42.

consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in [s]ection 4320.[28]"  (*Id.*, subd. (b).)  "The fact that the party requesting an award of

---

**28**     Section 4320 provides:

"In ordering spousal support …, the court shall consider all of the following circumstances:

"(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage ….  [¶] … [¶]

"(b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party.

"(c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living.

"(d) The needs of each party based on the standard of living established during the marriage.

"(e) The obligations and assets, including the separate property, of each party.

"(f) The duration of the marriage.

"(g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party.

"(h) The age and health of the parties.

"(i) Documented evidence of any history of domestic violence … between the parties or perpetrated by either party against either party's child ….

"(j) The immediate and specific tax consequences to each party.

"(k) The balance of the hardships to each party.

"(l) The goal that the supported party shall be self-supporting within a reasonable period of time….

[*fn. cont'd on next page*]

attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested." (*Ibid.*; see *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 315 ["'A *disparity* in the parties' respective circumstances may itself demonstrate relative "need" even though the applicant spouse admittedly has the funds to pay his or her fees.'"]; *In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877 [Second Appellate Dist. affirmed the husband's award of $450,000 in attorney's fees given that the wife had at least $40 million in assets while the husband had $2 million in assets].) Moreover, "[f]inancial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b); see *Alan S.*, *supra*, 172 Cal.App.4th at p. 254 ["[A] pendente lite fee award should be the product of a nuanced process in which the trial court should try to get the 'big picture' of the case …. Conversely, determination of a pendente lite attorney['s] fee order is definitely not a truncated process where the trial court simply (a) ascertains which party has the higher nominal income relative to the other, and then (b) massages the fee request of the lesser-income party into some manageable amount that feels like it will pass an abuse of discretion test."].)

"When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under … section [2030] is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding

---

"(m) The criminal conviction of an abusive spouse shall be considered in making a reduction or elimination of a spousal support award ….

"(n) Any other factors the court determines are just and equitable."

44.

attorney's fees and costs." (§ 2030, subd. (a)(2).) "The public policy purpose behind sections 2030 and 2032 is "'leveling the playing field" and permitting the lower-earning spouse to pay counsel and experts to litigate the issues in the same manner as the spouse with higher earnings.' [Citation.]" (*Tharp*, *supra*, 188 Cal.App.4th at p. 1315.) "'The major factors to be considered by a court in fixing a reasonable attorney's fee [include] "the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded [citation]; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed. [Citations.]" [Citations.]' [Citation.]" (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 870; see *In re Marriage of Huntington* (1992) 10 Cal.App.4th 1513, 1524 ["'When the trial court is informed of the extent and nature of the services rendered, it may rely on its own experience and knowledge in determining their reasonable value.'"].) "'"The exercise of sound discretion by the trial court in the matter of attorney's fees includes also judicial evaluation of whether counsel's skill and effort were wisely devoted to the expeditious disposition of the case."' [Citation.] '[S]ervices which have no apparent effect other than to prolong and to complicate domestic litigation cannot be deemed "reasonably necessary" [citation] "to properly litigate the controversy …."'" [Citation.]" (*In re Marriage of Turkanis & Price* (2013) 213 Cal.App.4th 332, 356.)

### III. The superior court did not abuse its discretion when it awarded Christine $80,000 in attorney's fees and $32,000 in costs.

The court did not abuse its discretion when it awarded Christine $80,000 in attorney's fees and $32,000 in costs. At the outset, it determined that not all of her purported $160,000-plus in fees and costs were reasonably necessary. Christine overspent on appraisers, did not need to hire both Hatherley and Hepperly, and should have sought a bifurcated hearing. In addition, Hatherley used too many timekeepers to

45.

bill and overcharged for certain tasks and services. Nevertheless, with regard to the "relative circumstances of the respective parties" (§ 2032, subd. (a)), the evidence—viewed in the light most favorable to the order—established Christine's relative need and Walter's ability to pay. According to her income and expense declaration, Christine earned $6,725 per month,[29] spent $12,773 per month, and possessed assets worth $142,500. According to his income and expense declaration, Walter earned $28,559.21 per month, spent $9,258 per month, and possessed assets worth $1.4 million. Christine's expert witnesses confirmed that the division-of-property arrangement set forth in the mediated MSA largely favored Walter. In fact, two of the properties allocated to him—Dreiling C and JF Dreiling—were sold in 2011 for a significant profit. Walter also purchased numerous properties in 2011 and 2012. (See *Tharp*, *supra*, 188 Cal.App.4th at pp. 1313-1314 ["In assessing one party's relative need and the other party's ability to pay, the family court may consider all evidence concerning the parties' current incomes, assets, and abilities, including investment and income-producing properties."].) The court even suspected that he engaged in dubious accounting practices since he was able to "lose [hundreds of thousands of dollars] annually and still … increas[e] … cash and assets." Walter himself admitted that he did not report the Dreiling C and JF Dreiling sales proceeds on his 2011 tax return, believing "he could avoid paying the taxes until 2012 through some sort of escrow arrangement …." (See § 4320, subd. (n) [other just and equitable factors].) Finally, the court found that "[t]he parties expended significant time and effort on routine discovery matters which should have involved minimal fees" "mostly due to Walt[er]'s failure to properly respond to discovery." (See *Tharp*, *supra*, at p. 1314 ["[I]n determining whether to award attorney['s] fees to one party, the family

---

**29** Walter insists that Douglas Rivers's monthly income must be included. (See *Alan S.*, *supra*, 172 Cal.App.4th at p. 255 [new mate income not statutorily irrelevant in pendente lite fee orders].) Even if it were included, however, Walter still earned more per month.

court may consider the other party's trial tactics."].)  A reasonable judge could have awarded Christine a need-based attorney's fees and costs award.

**IV.     The July 11, 2013, and October 24, 2013, awards were just and reasonable under the relative circumstances of the parties.**

In challenging the propriety of the July 11, 2013, and October 24, 2013, awards, Walter contends that (1) the court "erred in failing to include income of Christine's husband when applying the need based criteria"; (2) "Christine failed to establish a need for attorney['s] fees"; and (3) the court's "analysis on Walter's ability to pay … is driven by a fundamental misunderstanding of [his] tax returns."  (Boldface and some capitalization omitted.)  We agree with Walter that Douglas's income should have been part of the assessment.  It appears the court elected not to consider Douglas's income even though it determined that the money was available to Christine.  This was error.  "[N]ew mate or partner income … is *not* statutorily irrelevant in pendente lite fee orders….  The expansive language of section 2032—the 'relevant circumstances of the respective parties'— … shows it is certainly relevant for fee awards."  (*Alan S.*, *supra*, 172 Cal.App.4th at p. 255.)

Notwithstanding this error, however, substantial evidence supported the court's findings as to Christine's relative need and Walter's ability to pay.  The record—viewed in the light most favorable to the orders—shows that Christine earned $7,047.25 per month from her small business, rental properties, and royalty and overriding royalty interests and spent between $10,553.20 and $10,620 per month.  Douglas, who paid for some of the household expenses as well as part of Christine's legal fees, earned $11,100 per month.  Based on these figures, Christine and Douglas had a net monthly income between $7,527.25 and $7,594.05.  On the other hand, according to his May 8, 2013, income and expense declaration, Walter earned $17,661.26 per month from his farm work, oil working interests, dividends and interests, rental properties, royalties, and Social Security and spent only $4,447.17 per month.  Based on these figures, he had a net

47.

monthly income of $13,214.09.  While Walter's September 24, 2013, income and expense declaration presented a reduced gross monthly income of $15,602.68, his net monthly income—$11,155.51—still exceeded Christine and Douglas's combined amount.  Christine had assets worth $949,673.23 at most and could claim a grand total depreciable basis of $457,936 on her tax returns, but Walter had assets worth over $1.4 million and could claim a grand total depreciable basis of $660,439 on his tax returns.  Whereas Christine used her and Douglas's savings, credit cards, and home equity lines of credit to pay her attorneys, Walter principally used his earnings to pay his own.

The record also indicates that Walter, who primarily handled his and Christine's financial matters in the course of the marriage, consistently converted sizeable business income into a minimal or negative amount for tax purposes and acquired assets despite annual losses.  He obtained more valuable properties than Christine under the MSA, sold two such properties for over $800,000 in 2011, and reinvested the proceeds, but did not report the sales proceeds on his initial 2011 tax return in an attempt to avoid paying the taxes until 2012 via an escrow account.  In addition, Walter failed to fully comply with orders to produce documentation relating to income taxes, bank accounts, and business ventures.  (Cf. *In re Marriage of Hofer* (2012) 208 Cal.App.4th 454, 458 ["Where a party unlawfully withholds evidence of his income and assets, he will not be heard to complain that an order is not based on the evidence he refuses to disclose."].)  A reasonable judge could deduce that Walter (1) possessed financial savvy; (2) knew how to earn substantial returns on his investments; and (3) concealed his actual income, which had not been accurately represented to the court and was plausibly higher.  In view of the "'big picture' of the case" (*Alan S.*, *supra*, 172 Cal.App.4th at p. 254), we are not compelled to reverse the court's ruling.

**V.** **The superior court did not abuse its discretion when it awarded Christine $10,000 in costs for the enforcement of the January 8, 2013, award.**

On January 8, 2013, the court awarded Christine $80,000 in attorney's fees and $32,000 in costs pursuant to sections 2030 and 2032. In March 2013, Christine moved for the immediate payment of the January 8, 2013, award, pointing out that Walter failed to post an undertaking. On May 6, 2013, the court ruled that an undertaking was needed to stay execution of the January 8, 2013, attorney's fees and costs award. Although Walter maintains that he "immediately took action to get the bond prepared and filed, and kept Christine's counsel apprised of the status of that," an undertaking was not actually filed until July 30, 2013, nearly three months after the May 6, 2013, order. On October 24, 2013, the court recognized that Christine "had waited a long time" and awarded her $10,000 in costs associated with the collection of the January 8, 2013, award. (Cf. Hogoboom & King, Cal. Practice Guide:  Family Law (The Rutter Group 2014) ¶ 14:195, p. 14-66–14-67 ["[T]he opposing party's dilatory and uncooperative conduct may justify … [a] need-based fees and costs award …."].)  We find that this award of costs did not "'exceed[] the bounds of reason, all of the circumstances … being considered.'" (*Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 566.)

**VI.** **The October 24, 2013, award of attorney's fees did not contravene the policy underlying sections 2030 and 2032.**

Finally, Walter argues that the October 24, 2013, award of attorney's fees "was patently unfair to Walt[er]" because it "d[id] not constitute any effort to level the playing field to allow a spouse to pay attorney['s] fee[s], experts and the cost of litigation …." We disagree. As noted, upon a finding of disparity in access and ability to pay, the court must award attorney's fees and costs in a marital dissolution proceeding and "any proceeding subsequent to entry of a related judgment." (§ 2030, subd. (a)(1).)  As previously discussed, substantial evidence supported the court's findings of Christine's relative need and Walter's ability to pay. The extraordinary writ petition dealt with a

49.

question—i.e., whether a need-based attorney's fees and costs award in a family law proceeding may be bonded and stayed on appeal—that was germane to the issues in this case.**30** A reasonable judge could have awarded Christine attorney's fees in this instance. (See Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 16:477, p. 16-132 [either party in a family law writ proceeding may be entitled to need-based attorney's fees and costs award under §§ 2030 & 2032].)

## **DISPOSITION**

The January 8, July 11, and October 24, 2013, orders of the superior court are affirmed. Costs on appeal are awarded to Christine. We dismiss Christine's cross-appeal. (See *ante*, fn. 7.)

_____

DETJEN, J.

WE CONCUR:


_____

LEVY, Acting P.J.


_____

KANE, J.

---

**30** Walter asserts that "the law is clear that the need based attorney'[s] fee award is the same as a money judgment and can be bonded." A need-based award under sections 2030 and 2032, however, does not turn on the outcome of a dispute. (See Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 5:187, p. 5-91.)